Martin E. Rose [State Bar No. 62558]
Christopher M. McDowell [*Pro Hac Vice Forthcoming*]
**ROSE•WALKER, LLP**
3500 Maple Avenue, Suite 1200
Dallas, Texas 75219
Telephone: (214) 752-8600
Facsimile: (214) 752-8700
Email: mrose@rosewalker.com
Email: cmcdowell@rosewalker.com

John W. Shaw [State Bar No. 82802]
Timothy Toohey [State Bar No. 140117]
**MORRIS POLICH & PURDY LLP**
1055 West Seventh Street, 24th Floor
Los Angeles, California  90017
Telephone:    (213) 891-9100
Facsimile:    (213) 488-1178
Email: jshaw@mpplaw.com
Email: ttoohey@mpplaw.com
Attorneys for Plaintiff
TELEDYNE RISI, INC. d/b/a TELEDYNE
ELECTRONIC SAFETY PRODUCTS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TELEDYNE RISI, INC. d/b/a TELEDYNE ELECTRONIC SAFETY PRODUCTS a California  corporation, <br><br> Plaintiff, <br><br> vs. <br><br> MARTIN-BAKER AIRCRAFT COMPANY LTD., a United Kingdom corporation, MARTIN-BAKER AMERICA, INC., a subsidiary of MARTIN-BAKER AIRCRAFT COMPANY LTD. and DOES 1 through 100, Inclusive, <br><br> Defendants. | Case No. 15-cv- <br><br> **COMPLAINT FOR:** <br> 1. **BREACH OF WRITTEN CONTRACT;** <br> 2. **FRAUD;** <br> 3. **TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS;** <br> 4. **TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE;** <br> 5. **UNFAIR BUSINESS COMPETITION;** <br> 6. **TRADE SECRET MISAPPROPRIATION AND VIOLATIONS OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT;** <br> 7. **FRAUDULENT CONCEALMENT;** |

**8.  INJUNCTIVE RELIEF;**
**9.  EXEMPLARY DAMAGES; AND**

**DEMAND FOR JURY TRIAL**

Judge _____
Courtroom _____

## COMPLAINT

Teledyne RISI, Inc. d/b/a Teledyne Electronic Safety Products ("Teledyne" or "Plaintiff") by and through its attorneys Rose●Walker, L.L.P. files its original complaint against Martin-Baker Aircraft Company Ltd and Martin-Baker America, Inc. ("Defendants or MB") and would respectfully show the court as follows:

### THE PARTIES

1.      Plaintiff Teledyne RISI, Inc. d/b/a Teledyne Electronic Safety Products (hereinafter "Teledyne") is a corporation organized under the laws of the State of California, with its principal place of business in Chatsworth, California.

2.      Defendants Martin-Baker Aircraft Company, Ltd and Martin-Baker America, Inc., a subsidiary of Martin-Baker Aircraft Company, Ltd, (hereinafter, "MB") are corporations organized under the laws of the United Kingdom and the State of Delaware, respectively.

3.      This dispute arises out of a key component of the United States' defense against terrorism world-wide: the development and manufacture of the F-35 Joint Strike Fighter ("JSF") aircraft.  Defendants are participants in this United States Department of Defense ("DOD") program and have breached their contractual obligations to Plaintiff.  Defendants' conduct will irreparably harm Plaintiff and the United States JSF program if allowed to continue.  Defendants' breaches threaten Plaintiff's ability to perform its portion of the JSF DOD program.  Plaintiff seeks to compel MB to perform under its contracts and for damages resulting from their existing breaches.

/ / /

## JURISDICTION AND VENUE

4.     The United States District Court for the Central District of California has jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332(a) in that this is a civil action involving diverse parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.     As the factual allegations below demonstrate, the Court has general personal jurisdiction over MB because of it systematic and continuous contacts with California generally, and the Central District of California specifically.  The Court also has specific personal jurisdiction because the dispute at issue arises out of MB's conduct within California generally, and the Central District of California specifically.

## FACTUAL BACKGROUND

6.     Teledyne is a contractor engaged in the Joint Strike Fighter ("JSF") international development and production program led by the United States Department of Defense ("DOD").  It designs and manufactures ejection seat sequencers for all JSF models.  The sequencer is a key electronic component that coordinates the series of events necessary for a pilot to safely eject from the aircraft.

7.     MB is also a contractor engaged as an international participant in the DOD JSF program.  Its role is to manufacture the ejection seats which incorporate and rely upon Teledyne's sequencers to operate properly.

8.     The JSF program is led by DOD and its prime contractor, Lockheed Martin Corporation (hereinafter "LM").   The aircraft and its thousands of components are designed and manufactured throughout the country but the primary locations for manufacture and assembly are in California and Texas.

9.     Teledyne designs and manufactures the sequencers that are the subject of this action at its facility in Chatsworth, California.   It sells the sequencers to MB who takes delivery of them and pays for them in California

**COMPLAINT**

1    with payment to a lockbox at Bank of America in Los Angeles County,
2    California.

3    10.    MB would not and could not participate in the American JSF
4    program without extensive contacts in the United States in general and the states
5    of California and Texas, with particularity.   The nexus of this dispute lies in the
6    United States and specifically in the Central District of California.

7    11.    The parties entered into the contract at issue in the state of
8    California and performance of the contract has been and will continue to be
9    centered in California.

10    12.    Starting in the late 1990s Teledyne had a unique opportunity to
11    participate in the JSF program.  At the time of the initial development, it had the
12    only ejection seat sequencer that met the specification of the U.S. Government.
13    Knowing that others would try to copy the sequencer, Teledyne (and its
14    predecessor in interest) responded to its many suitors, including MB that any
15    potential partner in the bidding competition would have to commit to a long term
16    relationship- a relationship that extended for the full duration of the JSF program.
17    There were multiple bidders for the ejection seat.  All needed a sequencer giving
18    Teledyne the unique advantage of being able to choose who to partner with for
19    the project.

20    13.    The process of bidding to participate in a major DOD military
21    program is a complicated "dance" involving many potential partners and
22    extensive investment of time, manpower, and money.   The JSF program, from
23    the outset, was the largest procurement program of the U.S. Military and hence
24    the DOD.  The concept was to create one state of the art fighter aircraft that
25    would serve as a common platform for three branches of the U.S. military:  Air
26    Force, Navy and Marines.  The program was predicted to be the last major new
27    fighter aircraft to be designed and manufactured for decades to come.  All
28    bidders realized that they were not just bidding on a new program, they were

bidding on the opportunity to build components for the JSF program for decades to come.

14.   The JSF program was unique for yet another reason.  The U.S. Government ("USG") decided to allow eight key allies (subsequently expanded to include 14 countries) to participate in the DOD's largest international cooperative program.  The United Kingdom was one of them.  As such, its defense industry companies had the opportunity to also bid for the program. Defendants MB, which is based in the United Kingdom, therefore gained the chance to be a player in this most important of US military procurements.

15.   One of the essential realities of a major military procurement program, one designed to last decades, is to team up with other bidders and make a joint bid for an entire major system or component.  The ejection seat is one of those complex, major components that would be common to all JSF aircraft versions.  As bidding for the JSF program got under way, there were a number of potential suppliers for the ejection seats.   All of them needed Teledyne to effectively compete with a proven, compliant specification.

16.   As noted, Teledyne, had an advantage:  it was the only manufacturer of a sequencer that could meet the DOD specification for the JSF program. Teledyne had many suitors, but its goal was simple, straightforward, and announced loudly and clearly:  it would only partner with a bidder who promised that, if selected, it would buy ALL of the sequencers needed for the JSF program from Teledyne, and only Teledyne, for the lifetime of the program.

17.   MB, in an effort to gain an advantage in the competition for successful ejection seat bidder, pursued Teledyne vigorously in California.   MB and Teledyne had done business together for nearly two decades.  MB had relied on Teledyne to design and manufacture a variety of sequencers for its various ejection seats.

18.   MB convinced Teledyne that it was a reliable partner and that it was

**COMPLAINT**

1    willing to partner with Teledyne for the entire program, which was the key

2    reason Teledyne decided to entrust its sequencer technology to MB.  MB, in

3    scores of meetings, correspondence, emails and written proposals, agreed

4    unequivocally that, in exchange for Teledyne agreeing to partner with MB and

5    invest further in the program, MB would grant to Teledyne the "**exclusive**" right

6    to produce sequencers for the JSF program for "**the full duration of the JSF**

7    **program.**" (See Exhibit 1.)

8        19.    Teledyne, as the earliest and most successful designer and

9    manufacturer of ejection seat sequencers, knew that there would be

10   developments, modifications, and need for new designs and components over the

11   course of the JSF program.   Teledyne also recognized it had a distinct advantage

12   over other potential newcomers because of this tradition of innovation.

13   Accordingly, Teledyne anticipated and was prepared (and is prepared) to make

14   innovations, modifications, and design upgrades in a timely, efficient manner.

15   MB knew these facts as well and vigorously pursued Teledyne.   MB and

16   Teledyne even discussed and negotiated these prospective design and

17   manufacturing changes.

18       20.    Monumental DOD programs, like JSF, proceed in phases that often

19   consume decades, which are spent investing in design, procurement, and

20   planning, as well as production.   The JSF is no different.  It was designed to

21   proceed on multiple tracks with primary manufacturing occurring in three

22   phases:   System Development and Demonstration ("SDD") the LRIP phase

23   (Low-Rate Initial Production) to be followed later by the FRP phase (Full Rate

24   Production).

25       21.    The original teaming bidders consisted of two mainframe designers:

26   LM and Boeing.   In October of 2001, DOD selected LM as the winner of the

27   competition.  British Aerospace (hereinafter "BAE") was the LM team member

28   responsible for the cockpit which includes the ejection seat.

**COMPLAINT**

22.     The stakes in this teaming "dance" were enormous.   The JSF program included a planned total of more than 3,000 aircraft over the full life of the program.   Aircraft were to be purchased by the fourteen allies chosen by DOD to participate.   Moreover, history told all bidders that, as the decades progressed, more aircraft were likely to be ordered than these initial forecasts. In addition, the production of spare parts, replacements, support equipment, logistics, training, etc., increased the long-term value of the contract and program to Teledyne.

23.     Throughout 2002 and the first half of 2003, MB and Teledyne Electronic Safety Products ("TESP")[1] negotiated at length following word that their team had won the bidding process.   The goal was to create a Master Supply Agreement that would bind the parties to the full life of the JSF program while allowing the flexibility needed in the future for pricing changes, design changes, etc. In July of 2003, MB and TESP finalized an elegantly simple Master Supply Agreement.  In 2012, all of TESP's business and assets, including all rights under the MSA were transferred to Teledyne RISI, Inc., which then registered to do business as Teledyne Electronic Safety Products.

24.     The final MSA, Exhibit 1 to this complaint, contained all the terms necessary for both parties to be able to perform for the several decades that would be the "full duration" of the JSF program.   Among those key provisions, the agreement expressly provided:

      i.   Teledyne would provide sequencers for the then existing SDD phase program;

     ii.   Teledyne would provide sequencers for all future build programs, including LRIP and FRP build lots;

    iii.   If and when a contract was awarded to MB for future builds of the

---

[1] In 2003 when the MSA was executed, TESP was an unincorporated division of Teledyne Technologies Incorporated.

JSF ejection system, Teledyne would get a purchase order for supplying the sequencers;

iv. Teledyne was the exclusive provider of sequencers to MB for the entire duration of the JSF program;

v. Both parties were obligated to negotiate and agree on mutually acceptable prices for all purchase orders for the full duration of the program;

vi. A predictable maximum pricing for the existing design, i.e., that Teledyne would not exceed stated price NTE (not to exceed) prices even during much later LRIP (Low Rate Initial Production) and FRP (Full Rate Production) unless the design standard changed in the SOW (the Statement of Work) for the JSF contract;

vii. Teledyne's obligation to fund an extensive list of investment activities within the JSF framework;

viii. Individual work orders for production lots would be issued by MB to Teledyne using the agreed pricing table within the framework of the MSA.

25. Following execution of the MSA in July of 2003, the parties commenced mutual performance under the MSA. In reliance on the partnering relationship created by the MSA, Teledyne shared its confidential design, manufacturing, and pricing information with MB so that MB could gain further advantage in the program to the mutual benefit of both parties to the contract.

26. Pursuant to the MSA, MB and Teledyne entered into the following purchase orders for the following lots under the referenced phase of production:

i. Purchase order #4500031732 for lot DEV under the SDD program

ii. Purchase Order #4500037583 for lot 1 under the LRIP program;

iii. Purchase Order #450059305 for Lot 2 under the LRIP program;

iv. Purchase Order # 4500103258 for Lot 3 under the LRIP program;

v.   Purchase Order # 4500103258 for Lot 4 under the LRIP program;

vi.   Purchase Order # 4500116056 for Lot 4 under the LRIP program;

vii.   Purchase Order #4500126238 for Lot 5 under the LRIP program;

viii.   Purchase Order #4500120267 for Lot 6 under the LRIP program;

ix.   Purchase Order #4500144103  for Lot 7 under the LRIP program;

x.   Purchase Order #4500149547  for Lot 7 under the LRIP program;

xi.   Purchase Order #4500159386 for Lot 8 under the LRIP program;

xii.   Purchase Order #4500159387 for Lot 8 under the LRIP program;

xiii.   Purchase Order #4500175808 for Lot 9 under the LRIP program.

27.    Teledyne fully relied on the contractual promises and commitment of MB.  In reliance of the relationship created by the MSA, Teledyne invested substantial amounts of money, material, and manpower year after year in support of the JSF program and MB's role in the program.   Teledyne also fully performed under the contract; and under each and every Purchase order outlined herein.  To date, MB has not notified Teledyne of any breach of any of the purchase orders.  To date Teledyne has delivered fully compliant sequencers to MB and LM.  To date, Teledyne has been a committed and cooperative partner in the teaming relationship and the MSA.

## DEFENDANTS' CONDUCT

28.    On several occasions, MB received information about design changes and modifications from BAE or LM. Once received, MB normally provided the information to Teledyne so that it could perform under the MSA to the benefit of MB and Teledyne while providing sequencers that met each design change and modification.

29.    On information and belief, Defendants breached the MSA contract by failing to provide current design change information to Plaintiff so that Plaintiff could design and manufacture required modifications to the sequencer that would be required in subsequent lots of production.  Specifically, sometime

in 2013- 2014, LM notified MB of a requirement for a switching mechanism for ejection seats to accommodate female fighter pilots who are lighter in weight and frame.  The reason for the lighter weight option was to reduce ejection forces and alter other sequencing in those instances where the plane is piloted by lighter weight pilots.  Under the MSA and the overall JSF award, MB was required to supply that specification to Teledyne so that Teledyne could timely design (if necessary or called for), test, qualify and build the alternative switch mechanism - a task Teledyne is uniquely able to perform.  Instead of complying with their contractual and legal obligations, MB deliberately hid this new requirement from Teledyne.  Teledyne is further informed and believes that MB actively misled LM into believing Teledyne was informed and was developing the switch in order that LM not intervene and prevent MB's breach.

30.   Defendants breached the agreement by withholding the new specification from Teledyne and secretly developing their own design paid for by US DOD funding.  Moreover MB acted secretly by qualifying a new source for the sequencer used in the JSF program, and entering into a contract with that new source in breach of the sole source MSA agreement.  Moreover, the design MB intends to proceed with is taken from Teledyne's work and confidential information.   Defendants most recently informed Plaintiff for the first time that they contracted with a new source, awarded a development contract to the new source, and intend to award current production JSF purchase orders to this unnamed new source.

31.   MB's breaches and acts were deliberate.  MB's acts were for the sole purpose of depriving Teledyne of the bargain it reached and were carefully designed to eliminate Teledyne from the JSF program.

32.   Plaintiff is entitled to specific performance of the MSA because the provision of sequencers under JSF can only be attained through MB, the approved contractor for the Ejection Seat on the JSF program.      Plaintiff's

**COMPLAINT**

business will be irreparably harmed if the court does not order specific performance for each of the following reasons, among others:

    i. Plaintiff will be cut out of future production orders by LM, DOD, and foreign nations under the JSF program;

    ii. Plaintiff's technology and position based on its sequencer innovation will be lost, not only for JSF, but other USG and foreign programs;

    iii. Plaintiff's reputation in the defense industry will be irreparably harmed by being ousted from a highly visible program;

    iv. The lost revenue from such lost business will not adequately compensate Plaintiff for their damages because Plaintiff will be unable to:

        1. Maintain technical currency in defense aircraft programs;

        2. Maintain its reputation as a current supplier of state of the art sequencers for military aircraft;

        3. Gain new contract opportunities from participants in the JSF program and other military suppliers pursuing new programs;

        4. Participate in the next LRIP in the JSF program, an order that included a forward, ongoing design change that would be included in all future production, which will effectively lock Teledyne out of the JSF program for the full duration of remaining orders.

    v. Plaintiff will have lost the benefit of the bargain; to wit, Plaintiff invested in and contracted for the right to be involved in the program for its full term and that right cannot be compensated for in dollars alone.

33. MB did far more than breach the contract. It acted deliberately, maliciously to conceal its acts from Teledyne.

34.    On information and belief, Teledyne alleges that MB materially misrepresented facts to LM, BAE and other participants in the JSF program. Among other things when the LRIP order 10 was discussed and distributed, including the requirement for a new "light weight switch" design, MB affirmatively misrepresented to LM, BAE, DOD, that Teledyne would be provided the specification and would manufacture the new "light weight switch" design.

35.    Based upon MB's material misrepresentations to all participants in the JSF program, Teledyne was not alerted to the fraudulent activity undertaken by MB.    Based on the course of dealings of all parties- prime contractor, major sub-contractors, DOD, Departments of the Navy, Air Force and Marine Corp - had MB not actively concealed their true activities and disclosed their intention to discard Teledyne from the process, those participants would have promptly notified Teledyne and would have insisted on Teledyne's continued participation.

## COUNT ONE

## BREACH OF WRITTEN CONTRACT

36.    Teledyne incorporates herein the allegations contained in the paragraphs above and below

37.    MB breached its MSA contract in, among other things:

 i. Failing to flow down orders for the next production LRIP to Teledyne as required by the MSA;

 ii. Failing to negotiate price terms for new designs and further production under the MSA;

 iii. Failing to keep Teledyne as the exclusive provider of sequencers for the full duration of the JSF program;

 iv. Utilizing Teledyne's design and confidential information to create a competing sequencer;

 v. Excluding Teledyne from the design of the new sequencer; and

**COMPLAINT**

vi.  Contracting with a new source for development and production of the new sequencer.

38.    MB has proximately caused damages to Teledyne by its breach of the MSA contract.

39.    Teledyne is entitled to attorney fees and costs necessary to bring this action and recover for MB's breaches of the MSA agreement.

<u>**COUNT TWO**</u>

<u>**FRAUD**</u>

40.    Teledyne incorporates herein the allegations contained in the paragraphs above and below.

41.    MB knowingly made false, material representations to Teledyne. Specifically, MB repeatedly and purportedly kept Teledyne advised that it would pass on all new build orders, new design specifications, and all other information regarding the JSF program to Teledyne.   MB in fact did not intend to follow its contractual and course of dealing obligations and did not do so.   Instead, MB intended to trick Teledyne and lull them into believing the relationship was continuing under the contract and as it had progressed for the previous 15 years.

42.    MB intended that Teledyne would rely on its false statements. Teledyne did in fact rely on those false statements and did so until first indications of larceny arose, in August of 2015.

43.    As a direct and proximate result of MB's false representations, Teledyne suffered damages that will have a direct effect in the State of California, where Teledyne is headquartered.

44.    Teledyne is entitled to actual damages in an amount sufficient to compensate it for the harm sustained, including foreseeable lost profits.

45.    Teledyne is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

/ / /

## COUNT THREE

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

46.   Teledyne incorporates herein the allegations contained in the paragraphs above and below.

47.   As set forth above and below herein, MB, through its malicious and deliberate scheme, directly interfered with existing relationships related to other military programs and contracts, including among them, the F-18/T-45 program. Such direct interference has and will continue to result in damages to Teledyne as set forth herein.

48.   MB has been unjustly enriched by its tortious interference with the JSF program and Teledyne is entitled to measure its damages, at least in part, by disgorgement of all revenues received by MB as a result of its tortious interference.

## COUNT FOUR

## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE BUSINESS ADVANTAGE

49.   Teledyne incorporates herein the allegations contained in the paragraphs above and below.

50.   MB has deliberately and willfully interfered with Teledyne's prospective advantage in the international and domestic ejection seat sequencer marketplace set forth above and below in more detail.

51.   Such deliberate, willful, and tortious interference has damaged Teledyne and continues to damage Teledyne.  It is reasonably foreseeable that such interference, until stopped by order of this court, will damage Teledyne into the future.

52.   MB has been and will continue to be unjustly enriched by its interference in the sequencer marketplace.  Teledyne is entitled to measure its damages, at least in part, by compelling disgorgement of all revenues received by

1   MB in other international and domestic, military and commercial programs as a

2   result of its ongoing tortious interference.

3   **COUNT FIVE**

4   **UNFAIR BUSINESS COMPETITION**

5        53.     Teledyne incorporates herein the allegations contained in the

6   paragraphs above and below.

7        54.     MB exercised possession, custody, and control over confidential and

8   proprietary information that Teledyne provided to it in the JSF program and in

9   other military and commercial ventures.   MB had no right to use that

10  information for any reason unrelated to the MSA and the joint development and

11  protection of the JSF ejection seat with Teledyne. MB, nevertheless, used that

12  proprietary information to instead cut Teledyne out of the JSF program and

13  unfairly compete in the JSF program, unburdened by the extensive design and

14  manufacturing costs of starting from scratch.   MB also was contractually

15  prohibited from participating in the sequencer manufacturing business in the JSF

16  program and by doing so as alleged herein, unfairly competed with and damaged

17  Teledyne.

18       55.     MB's acts, as alleged herein, also enable it to unfairly compete with

19  Teledyne for sequencer business in other US Domestic and international

20  programs to which it had no ability to compete without Teledyne's information

21  and knowhow.

22       56.     Teledyne has suffered damage because of MB's unfair competition

23  and competitive edge and is entitled to recover all damages as a result.

24       57.     Teledyne is also entitled to recover from MB, through

25  disgorgement, all revenue and profits MB received from its unfair competition.

26  / / /

27  / / /

28  / / /

## COUNT SIX

## TRADE SECRET MISAPPROPRIATION AND VIOLATIONS OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT

58.   Teledyne incorporates herein the allegations contained in the paragraphs above and below.

59.   Teledyne is the owner of all right, title and interest in various designs, techniques, processes, materials, and methods of fabrication of sequencers and their associated components, as well as experimental information related to the evaluation and selection of such designs, techniques, processes, materials and methods.  Teledyne is also the owner of all right, title and interest in various pricing and marketing information related to its sequencer business worldwide.  These are hereinafter referred to "Trade Secrets".  The Trade Secrets were discovered and developed by Teledyne over an extensive period of time and with an extensive investment of labor, skill and money.

60.   Teledyne derives independent economic value, both actual and potential, and is afforded an opportunity to obtain an advantage over its competitors from the fact that the Trade Secrets are not generally known to the public or to other persons who can obtain economic value from their disclosure or use.

61.   The Trade Secrets are confidential and are the subject of efforts by Teledyne that are reasonable under the circumstances to maintain their secrecy.

62.   The Trade Secrets were disclosed to MB under circumstances giving rise to an obligation not to use or disclose the Trade Secrets to the detriment of Teledyne.

63.   MB wrongfully acquired some or all of the Trade Secrets by using improper means to acquire their knowledge of the Trade Secrets.  MB wrongfully used Teledyne's Trade Secrets without Teledyne's knowledge or express or implied consent, when they knew, or had reason to know that the Trade Secrets

were acquired under circumstances giving rise to a duty to maintain their secrecy, from or through persons who owed a duty to Teledyne to maintain the secrecy and limit the use of the Trade Secrets and who had neither express nor implied consent to make sure disclosure.

64.     MB used the Trade Secrets in the creation of a product offered for sale on the JSF program in lieu of Teledyne's sequencer.  MB further used the Trade Secrets to gain a competitive pricing, bidding and specification advantage over Teledyne in pursuit of the JSF program.

65.     Teledyne is informed and believes and so alleges that MB has used the Trade Secrets in other contracts, bids, offers and projects to its competitive advantage and for profit.

66.     MB misappropriated Teledyne's Trade Secrets.

67.     The misappropriation by MB has been willful and malicious.

68.     Teledyne has suffered damages as a result of the alleged misappropriation.

## COUNT SEVEN
## FRAUDULENT CONCEALMENT

69.     Teledyne incorporates herein the allegations contained in the paragraphs above and below.

70.     MB actively concealed from Teledyne its true activities and its course of conduct designed not only to breach the contract between the parties, misappropriate trade secrets, and tortiously interfere with Teledyne's contracts; it knowingly and deliberately concealed its fraudulent activity from Teledyne in order to gain a competitive advantage and to drive Teledyne from the competitive marketplace for sequencer technology.

71.     MB knew that keeping Teledyne from the next LRIP in the JSF program, an order that included a forward, ongoing design change that would be included in all future production, would effectively lock Teledyne out of the JSF

program for the full duration of remaining orders.  Teledyne would not only be uncompetitive in price and production experience, it would not have been able to timely complete design, testing and qualification of its new design.

72.     MB also knew it would be able to gain competitive edge in the entire ejection seat international marketplace by offering a design that Teledyne did not have.   MB's purpose was simply to eliminate the most effective manufacturer of sequencers from the international military marketplace and supplant Teledyne with MB.

73.     MB would not have been able to compete at all, let alone effectively, had MB fulfilled its contractual duties and had MB not fraudulently concealed its activities from Teledyne.

74.     MB's concealment was deliberate and malicious and was made with willful intent to deceive.

75.     Teledyne has suffered damages as a result of the fraudulent concealment.

## **INJUNCTIVE RELIEF**

76.     Teledyne incorporates herein the allegations contained in the paragraphs above and below.

77.     Teledyne is further entitled to a temporary restraining order, preliminary injunction, and permanent injunction prohibiting and compelling MB:

a.     From purchasing JSF ejection seat sequencers from any supplier other than Teledyne;

b.     From utilizing any Trade Secret obtained from Teledyne for any purpose other than Teledyne and MB's joint effort to produce ejection seats for the JSF;

c.     From disclosing any Trade Secret or confidential information to any third party;

d.    To compel MB to specifically perform the MSA and immediately provide the current JSF design to Teledyne so that Teledyne can timely produce the sequencers.

e.    To prohibit MB from sharing Teledyne trade secrets with any third person or party.

78.    Teledyne is likely to succeed on the merits of its claims because it has a contractual right to serve as the exclusive provider of the JSF ejection seat sequencer for the lifetime of the program.  Teledyne is also the owner of the Trade Secrets that MB is now using to undermine Teledyne's right to serve as the exclusive sequencer manufacturer and to compete with Teledyne in providing that product.

79.    Teledyne will also suffer irreparable harm for numerous reasons including:

a.    Teledyne's confidential information and Trade Secrets will be irreparably compromised;

b.    Plaintiff will be cut out of future production orders by LM, DOD, and foreign nations under the JSF program;

c.    Plaintiff's technology and position based on its sequencer innovation will be lost, not only for JSF, but other USG and foreign programs;

d.    Plaintiff's reputation and goodwill in the defense industry will be irreparably harmed by being ousted from a highly visible program;

e.    The lost revenue from such lost business will not adequately compensate Plaintiff for its damages because Plaintiff will be unable to:

i.    Maintain technical currency in Defense aircraft programs;

ii.    Maintain its reputation as a current supplier of state of the art sequencers for military aircraft;

**COMPLAINT**

iii. Gain new contract opportunities from participants in the JSF program and other military suppliers pursuing new programs;

iv. Participate in the next LRIP in the JSF program, an order that included a forward, ongoing design change that would be included in all future production, which will effectively lock Teledyne out of the JSF program for the full duration of remaining orders

f. Plaintiff will have lost the benefit of the bargain; to wit, Plaintiff invested in and contracted for the right to be involved in the program for its full term and that right cannot be compensated for in dollars alone.

80. The balance of hardships tips heavily in favor of Teledyne for numerous reasons, including:

a. Teledyne stands to lose substantially valuable intangible assets like its Trade Secrets and confidential information, that cannot be recovered;

b. Teledyne stands to lose good will in the defense industry that cannot be quantified or easily recovered;

c. MB only stands to lose the opportunity to further breach the MSA and to unfairly utilize Teledyne's Trade Secrets and confidential information for an unfair competitive advantage.

81. The public interest weighs in favor of preventing MB from unfairly utilizing Teledyne's Trade Secrets and confidential information for its own tortious use.

## **EXEMPLARY DAMAGES**

82. In addition to actual damages, Plaintiff seek exemplary damages for the outrageous, malicious and otherwise morally culpable conduct of the Defendants and to deter such conduct in the future.

/ / /

## REQUESTED RELIEF

Wherefore, Teledyne prays for entry of judgment:

1.     Plaintiff be granted a temporary and then permanent injunction preventing MB from competing against Plaintiff in the sequencer business;

2.     Plaintiff be granted a temporary and permanent injunction compelling MB to continue to perform under the MSA for the full duration of the JSF program;

3.     Plaintiff be granted judgment against Defendants for actual, consequential and compensatory damages and such other injunctive relief for which it is allowed by law;

4.     Plaintiff be granted judgment for reasonable attorneys fee as allowed by law through appeal;

5.     The court award prejudgment and post judgment interest as allowed by law;

6.     Plaintiff be granted exemplary damages as against MB;

7.     Plaintiff be granted judgment for all costs of court; and,

8.     Any such other and further relief to which Plaintiff may be entitled.

Dated:  October 8, 2015.            ROSE•WALKER, LLP

*/s/ Martin E. Rose*
Martin E. Rose
mrose@rosewalker.com
Attorney-in-Charge
California State Bar No. 62558

Christopher M. McDowell [*Pro Hac Vice Forthcoming*]
cmcdowell@rosewalker.com
Attorney-to-be-Noticed

.                MORRIS POLICH & PURDY, LLP
*/s/ John W. Shaw*
John W. Shaw
jshaw@mpplaw.com

Attorneys for Plaintiff
TELEDYNE RISI, INC. d/b/a TELEDYNE
ELECTRONIC SAFETY PRODUCTS

1

## JURY TRIAL DEMAND

2       Pursuant to Fed. R. Civ. P. 38, Teledyne Risi, Inc. dba. Teledyne

3   Electronic Safety Products hereby demands a trial by jury for all issues so triable,

4   including all of Teledyne Risi, Inc. dba. Teledyne Electronic Safety Products'

5   claims and any affirmative defenses that may be asserted by the Defendants

6   herein.

7   Dated: October 8, 2015.         ROSE•WALKER, LLP
                                    */s/ Martin E. Rose*
8                                   Martin E. Rose
                                    mrose@rosewalker.com
9                                   Attorney-in-Charge
                                    California State Bar No. 62558
10
                                    Christopher M. McDowell [*Pro Hac Vice Forthcoming*]
11                                  cmcdowell@rosewalker.com
                                    Attorney-to-be-Noticed
12

13                                  MORRIS POLICH & PURDY, LLP

14                                  */s/ John W. Shaw*
                                    John W. Shaw
15                                  jshaw@mpplaw.com

16                                  Attorneys for Plaintiff
                                    TELEDYNE RISI, INC. d/b/a TELEDYNE
17                                  ELECTRONIC SAFETY PRODUCTS

18

19

20

21

22

23

24

25

26

27

28