MATTHEW H. KIRTLAND (*pro hac vice*)
KATHERINE G. CONNOLLY (BAR NO. 313640)
**NORTON ROSE FULBRIGHT US LLP**
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Telephone:   (202) 662-4659
Facsimile:   (202) 662-4643
matthew.kirtland@nortonrosefulbright.com
katie.connolly@nortonrosefulbright.com

JOSHUA D. LICHTMAN (BAR NO. 176143)
**NORTON ROSE FULBRIGHT US LLP**
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone:   (213) 892-9200
Facsimile:   (213) 892-9494
joshua.lichtman@nortonrosefulbright.com

Attorneys for Defendant
MARTIN-BAKER AIRCRAFT COMPANY LTD.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| TELEDYNE RISI, INC. d/b/a TELEDYNE ELECTRONIC SAFETY PRODUCTS,<br><br>        Plaintiff,<br><br>        v.<br><br>MARTIN-BAKER AIRCRAFT COMPANY LTD,<br><br>        Defendant. | Case No. 2:15-CV-07936-SJO-GJS<br><br>Hon. S. James Otero<br><br>**DEFENDANT MARTIN-BAKER AIRCRAFT COMPANY LTD.'S MOTION IN LIMINE NO. 3 TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF'S EXPERT MARK NEWTON**<br><br>Trial: November 21, 2017<br>Time: 9:00 a.m.<br>Ctrm.:  10C |

ii36876711.1

2:15-CV-07936-SJO-GJS

MOTION IN LIMINE NO. 3 TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF EXPERT MARK NEWTON

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   LEGAL STANDARD TO ADMIT EXPERT OPINION ................................... 1

III.  ARGUMENT ................................................................................................. 4

IV.   MR. NEWTON'S NACES PROGRAM OPINIONS ........................................ 5

    A.    Teledyne's NACES claims are no longer at issue in this case; Mr. Newton's related opinions must therefore be excluded ................. 5

    B.    Mr. Newton's opinions on Teledyne's alleged damages from "Lost Fastr Sequencers" are based on pure speculation ................................. 5

        1.    There is no evidence for Mr. Newton's assumption that the U.S. Navy will retrofit the NACES fleet with new sequencers ........... 6

        2.    There is no evidence for Mr. Newton's assumption that non-Teledyne sequencers will be used for 213 new F-18 seats .......... 7

    C.    Mr. Newton's opinion on Teledyne's alleged damages from "Lost Fastr Repair Revenue" should be excluded ............................................ 7

    D.    Mr. Newton's opinions also are based on the inherent speculation that Martin-Baker would contract in the future with Teledyne ................... 9

    E.    Mr. Newton's Miscellaneous Errors and Unfounded Opinions ........... 9

V.    MR. NEWTON'S JSF PROGRAM OPINIONS ............................................. 10

    A.    Mr. Newton's opinion on Teledyne's alleged damages from future lost JSF repair contracts should be excluded ............................................. 11

    B.    Mr. Newton's opinions regarding Teledyne's alleged lost profit from future sales of JSF sequencers to Martin-Baker should be excluded because they are based on pure speculation or erroneous assumptions ...................................................................................... 12

        1.    Mr. Newton's opinion that it would sell 9,300 future JSF sequencers to Martin-Baker is pure speculation and should be excluded .................................................................................... 12

        2.    Mr. Newton's assumption that there will be 1,259 "additional planes" is pure speculation ....................................................... 14

        3.    Mr. Newton's assumption that there will be 229 JSF "spares" is pure speculation ................................................................... 15

        4.    Mr. Newton's assumption that Teledyne would sell an additional 3,710 "periodic replacement" JSF sequencers to Martin-Baker is pure speculation .................................................................... 15

        5.    Mr. Newton's assumption that Teledyne would supply an additional 454 "beyond economic repair replacement" JSF sequencers to Martin-Baker is pure speculation ........................ 16

    C.    Mr. Newton's assumed future sales price of JSF sequencers is based on erroneous speculation ................................................................... 17

    D.    Mr. Newton's opinion regarding Teledyne's projected future profit margins must be excluded .................................................................. 18

VI.   CONCLUSION ............................................................................................ 20

DOCUMENT PREPARED
ON RECYCLED PAPER

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acree v. General Motors Acceptance Corp.*
(2001) 92 CA4th 385 ..................................................................... 10

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*
(1994) 7 Cal.4th 503 ...................................................................... 11

*Estate of Barabin v. AstenJohnson, Inc.,*
740 F.3d 457 (9th Cir. 2014) ......................................................2, 4

*Bogosian v. Mercedes-Benz,*
104 F.3d 472 (1st Cir. 1997) ............................................................ 2

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.,*
226 Cal. App. 3d 442 (1990) .......................................................... 14

*Cabrera v. Cordis Corp.,*
134 F.3d 1418 (9th Cir. 1998) ...................................................6, 10

*Citri-Lite Co. v. Cott Beverages,*
721 F. Supp. 2d 912 (E.D. Cal. 2010) ........................................... 13

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir. 1995) (*Daubert II*) ..................................2, 3

*Daubert v. Merrell Dow Pharms.,*
509 U.S. 579 (1993) .......................................................1, 2, 3, 4, 5, 11

*Dep't of Toxic Substances Control v. Technichem, Inc.,* 2016 WL
1029463, at *1 (N.D. Cal. 2016) ................................................... 14

*Kennedy v. Collagen Corp.,*
161 F.3d 1226 (9th Cir. 1998) .......................................................... 3

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ...................................................................2, 3,4

*Lapinee Trade, Inc. v. Boon Rawd Brewery Co., Ltd.,*
91 F.3d 909 (7th Cir. 1996) ............................................................ 14

*Lewis Jorge Construction Management, Inc. v. Pomona Unified
School District,*
34 Cal. 4th 960 (2004)............................................................7, 10, 11

*Lust v. Merrell Dow Pharm., Inc.,*
89 F.3d 594 (9th Cir. 1996) .............................................................. 1

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*
(2010) 191 CA4th 435 ......................................................................... 14

*McGlinchy v. Shell Chem. Co.,*
845 F.2d 802 (9th Cir. 1988) ............................................................. 20

*Mesfun v. Hagos,*
No. CV 03-02182 MMM ...................................................................... 7

*Mukhtar v. Cal. State Univ., Hayward,*
299 F.3d 1053 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir.
2003) ................................................................................................ 2, 3

*Ollier v. Sweetwater Union High Sch. Dist.,*
768 F.3d 843 (9th Cir. 2014) ............................................................ 2, 4

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.,*
752 F.3d 807 (9th Cir. 2015) ................................................................ 4

*San Diego Gas & Elec. Co.,* No. 15CV605-MMA (KSC), 2016 WL
6680205, at \*7 ................................................................................. 18

*United States v. Bighead,*
128 F.3d 1329 (9th Cir. 1997) .............................................................. 7

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000) .............................................................. 2

*United States v. King,*
703 F. Supp. 2d 1063 (D. Haw. 2010) ................................................... 3

**Rules and Statutes**

Cal. Code Civ. P. § 3358 ........................................................................ 10

Fed. R. Evid. 702 ......................................................................... 1, 2, 3, 4

Fed. R. Evid. Rule 402 ........................................................................... 1, 3

Fed. R. Evid. Rule 403 ........................................................................... 1, 3

## I.     <u>INTRODUCTION</u>

Pursuant to Fed. R. Evid. 402, 403, and 702, Defendant Martin-Baker Aircraft Company Ltd. ("Martin-Baker") moves *in limine* to exclude or limit the opinion testimony of Mark Newton ("Mr. Newton") proffered by Plaintiff Teledyne RISI, Inc. d/b/a Teledyne Electronic Safety Products ("Teledyne").

Teledyne designated Mr Newton as an expert purportedly "to calculate the economic loss suffered by" Teledyne as a "a direct result of breach of contract and unfair competition practices conducted by" Martin-Baker. *See* Ex. 1 (Newton Report). In fact, Mr. Newton's expert report and purported opinions to a large extent are (1) devoted to matters no longer at issue in this case, (ii) based on pure speculation, or (iii) based on erroneous information or methodologies. Under the Federal Rules, this Court must act as a "gatekeeper" to preclude improper expert testimony. *See, e.g., Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993). In the exercise of this function, the Court should exclude or limit the opinions of Mr. Newton, as set out below.

## II.     <u>LEGAL STANDARD TO ADMIT EXPERT OPINION</u>

"The proponent of [an] expert . . . has the burden of proving admissibility." *Lust v. Merrell Dow Pharm., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996). Expert opinion is admissible only if the expert is qualified, testifies as to matters within the scope of his or her expertise, the testimony will be helpful to the jury in determining a fact in issue, and the opinion is both relevant and reliable. *See* Fed. R. Evid. 702.

The Ninth Circuit has identified six non-exclusive factors as guidelines for a trial court's assessment of proposed expert testimony pursuant to Fed. R. Evid. 702 and the further standards announced in *Daubert*: (1) "[w]hether the opinion is based on scientific, technical, or other specialized knowledge"; (2) "[w]hether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue"; (3) "[w]hether the expert has appropriate qualifications – *i.e.*, some

special knowledge, skill, experience, training or education on the subject matter"; (4) "[w]hether the testimony is relevant and reliable"; (5) "[w]hether the methodology or technique the expert uses 'fits' the conclusions"; and (6) "[w]hether the probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *see also Ollier v. Sweetwater Union High Sch. Dist.,* 768 F.3d 843, 860 (9th Cir. 2014) ("It is well settled that bare qualifications alone cannot establish the admissibility of expert testimony.")

Both *Daubert* and subsequent cases have emphasized that these factors are not "equally applicable (or applicable at all) in every case." *Daubert v. Merrell Dow Pharm.*, *Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (applicability of the *Daubert* factors "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.") Because of the fluid and contextual nature of the inquiry, district courts are vested with "broad latitude" to determine "whether or not [an] expert's relevant testimony is reliable." *Id.* at 152-53. But, "the duty falls squarely upon the district court to act as a 'gatekeeper' to exclude testimony that does not meet [Rule] 702's reliability standards." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal citations omitted).

Accordingly, in cases where *Daubert's* specific discussion of the admissibility of scientific principles does not strictly apply to proffered expert testimony, its admissibility is primarily controlled by the requirements of (1) "factual relevance" (which includes assessment of whether the evidence will be helpful to the trier of fact and not unfairly prejudicial) and (2) "foundational reliability." *Bogosian v. Mercedes-Benz*, 104 F.3d 472, 479 (1st Cir. 1997); *Ollier,* 768 F.3d at 860 ("we have interpreted Rule 702 to require that expert testimony be both relevant and reliable"); *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053,

DOCUMENT PREPARED
ON RECYCLED PAPER

1063 n.7 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

First, as to the relevance consideration, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue'." *Daubert*, 509 U.S. at 591 (internal citations omitted). "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Id.* at 591-92 (internal citations omitted.) As irrelevant evidence is always inadmissible under Rule 402, courts employ a higher standard than mere relevance in assessing this component of the test for admissibility of expert testimony.

This "consideration has been aptly described … as one of 'fit.' … 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*; *see also Kumho Tire*, 526 U.S. at 150. Under this relevance or "fit" prong, the proffered testimony "must be 'relevant to the task at hand,' *i.e.,* [it must] logically advance a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315, quoting *Daubert*, 509 U.S. at 597; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) (relevance requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case). Further, the *Daubert* "fit" test is not merely a recitation of Rule 402. *See United States v. King,* 703 F. Supp. 2d 1063, 1069 (D. Haw. 2010). Instead, due to the Supreme Court's recognition that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," under *Daubert's* "fit" test the "judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595; *see Mukhtar*, 299 F.3d at 1063 n.7 ("[e]ncompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702.").

Second, as to reliability, a court should exclude the testimony of an expert if

it is not reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1175 (1999). "Expert testimony … is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2015). The Supreme Court has suggested several non-exclusive factors for courts to consider in assessing reliability[1], but the test is ultimately "flexible," and "the trial court has discretion" to decide how to assess reliability "based on the particular circumstances of the particular case." *Id.* at 813-14 (internal citations omitted); *see also Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 463 (9th Cir. 2014) (same). However, an expert opinion must be excluded if it is (1) based on subjective belief or unsupported speculation or (2) fails to assist the trier of fact in understanding the evidence or determining a fact at issue. *Daubert*, 509 U.S. at 590-91; *Ollier*, 768 F.3d at 861 ("personal opinion testimony is inadmissible as a matter of law under Rule 702" and "speculative testimony is inherently unreliable.")

## III.   ARGUMENT

Mr. Newton, in his report, opines that Teledyne has suffered **$24,832,113.00** in net present loss in relation to its Naval Aircrew Common Ejection Seat (NACES) program claims and **$47,205,889.00** in net present loss in relation to its Joint Strike Fighter (JSF) program claims. For the reasons set forth below, these numbers are grossly inflated by Mr. Newton's inclusion of claims that are no longer at issue in this case, the complete speculation underlying almost all of Mr. Newton's key assumptions, and his use of unreliable data and methodology.

---

[1] Such factors include: (1) whether a theory or technique can be and has been tested; (2) whether it has been peer reviewed and published; (3) the known or potential error rate of the theory; and (4) whether the theory enjoys general acceptance within the relevant scientific community. *See Daubert*, 509 U.S. at 593-94; *Pyramid Techs.,* 752 F.3d at 813.

## IV.   MR. NEWTON'S NACES PROGRAM OPINIONS

### A.   Teledyne's NACES claims are no longer at issue in this case; Mr. Newton's related opinions must therefore be excluded

A substantial portion of Mr. Newton's proffered testimony concerns an issue that was eliminated from this case by the Court's ruling on the parties' cross-motions for summary judgment, i.e., Teledyne's assumed future non-participation in further contracts under the NACES program. (ECF #136.) As noted in Martin-Baker's Motion in Limine No. 1, Teledyne's various NACES-related contentions provided the basis for Teledyne's claims for tortious interference with contract, tortious interference with prospective contract and violation of the UCL, which the Court either dismissed on Martin-Baker's motion to dismiss for failure to state a claim or its motion for summary judgment. (ECF #142 at 6-7) (citing ECF #33 at 6-7 and ECF #136 at 12-13.) Any argument by Teledyne that its NACES-related contentions are still in this case via its fraud and fraudulent concealment claims is incorrect, for the reasons set out by Martin-Baker in its Motion in Limine No. 1. (ECF #142 at 6-7.) Accordingly, Mr. Newton's opinions on the subject of Teledyne's alleged damages in relation to the NACES program are irrelevant and, therefore, must be excluded. *See Daubert*, 509 U.S. at 591 ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" to the jury as it does not "fit" the factual dispute that jury is asked to resolve).

However, even if Teledyne's NACES claims were still at issue in this case, which they are not, Mr. Newton's opinions regarding Teledyne's alleged damages in connection with those claims must be excluded for the following reasons.

### B.   Mr. Newton's opinions on Teledyne's alleged damages from "Lost Fastr Sequencers" are based on pure speculation

Mr. Newton's calculation of Teledyne's alleged damages in connection with the NACES program are based on his assumption that, but for Martin-Baker's alleged conduct, Teledyne would have, over the next *forty-three years* (from 2018

DOCUMENT PREPARED ON RECYCLED PAPER

through 2060), sold 3,242 additional NACES sequencers to Martin-Baker. (Ex. 1 at 13.) Mr. Newton calls these additional sequencers "Lost Fastr Sequencers." (*Id.*) In turn, Mr. Newton divides these sequencers into two categories:

(1)     2,725 "FASTr sequencers" that Mr. Newton assumes will be sold to Martin-Baker as part of a "future retrofitting" by the U.S. Navy of the entire NACES fleet, that he assumes will start in 2019, (*id.* at 3, 13, and Schedule 4.0); and

(2)     213 "FASTr sequencers" that Mr. Newton assumes will be used for "new F-18 seats that will be manufactured beginning in 2018." [2]

(*Id.* at 13.) Both of these assumptions are based on pure speculation, and the calculations upon which they are based must therefore be excluded.

### 1.     There is no evidence for Mr. Newton's assumption that the U.S. Navy will retrofit the NACES fleet with new sequencers

There is no evidentiary basis whatsoever for Mr. Newton's assumption that the U.S. Navy will retrofit the entire NACES fleet of planes, whether starting in 2019 or any time thereafter. Mr. Newton confirmed this at his deposition. (Ex. 2 at 93:16-96:9; 214:23-215:5.) Accordingly, there is no basis for Mr. Newton's calculations based on the 2,725 future NACES sequencers that Martin-Baker supposedly would have purchased from Teledyne for this non-existent retrofit.

Because there is no evidentiary basis that the future NACES retrofit on which Mr. Newton bases all of his calculations will actually occur, his opinion regarding the net present value of Teledyne's damages arising from the "lost" sequencer sales associated with this retrofit must be excluded as unreliable and speculative. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998) (expert testimony

---

[2] Mr. Newton also assumes that Martin-Baker would purchase 304 future sequencers for "beyond economic repair replacement" for the NACES program. *See* Ex. 1 at Schedule 4. This assumption has no support, for the reasons set forth below with respect to the JSF program. *See infra* at 16-17.

must be "more than subjective belief or unsupported speculation" to be admissible); *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) ("The 'reasoning' or 'methodology' of the expert must be examined by the court before the expert may be heard by the jury. Experts are not to testify to their subjective belief or unsupported speculation. The relevance and the reliability of their testimony, tested in terms of the principles they apply, must pass muster"); *Mesfun v. Hagos*, No. CV 03-02182 MMM(RNBX), 2005 WL 5956612, at *11 (C.D. Cal. Feb. 16, 2005) ("Opinions of an expert need not be accepted when they are based on nothing more than personal opinion or belief, instead of an understandable scientific [or experiential] basis.").

## 2.   There is no evidence for Mr. Newton's assumption that non-Teledyne sequencers will be used for 213 new F-18 seats

As to Mr. Newton's second category of purposed "lost FASTr sequencers," his assumption ignores that the evidence on which he relies for the supposed "lost 213 sequencers" shows that, in fact, it will be Teledyne that will be supplying its FAST sequencer to the U.S. Navy for the next two lots of NACES sequencers under contract through FY 2017 (Lot 32a and b). (Ex. 3.) Mr. Newton's calculations improperly include these 22 Teledyne sequencers in his claimed 213 "lost FASTr sequencers. Beyond Lot 32b, any future contracts for sequencers for new F-18 seats are speculative because the contracts for such seats have not been issued by the U.S. Navy to Martin-Baker and there is therefore no certainty that the associated contracts for the sequencers for such seats will ever exist. *Lewis Jorge Construction Management, Inc. v. Pomona Unified School District*, 34 Cal. 4th 960, 977 (2004) (lost profits from future, unawarded contracts are not recoverable).

## C.   Mr. Newton's opinion on Teledyne's alleged damages from "Lost Fastr Repair Revenue" should be excluded

In addition to supposed lost profit from the sale of the future "lost FASTr sequencers," Mr. Newton calculates the present value of Teledyne's lost income

DOCUMENT PREPARED ON RECYCLED PAPER

from supposed future repairs of 1,947 "FASTr sequencers" that Teledyne will "lose" over the *next forty-three years* (from 2018 to 2060). (Ex. 1 at 13 (citing Newton Schedule 6.1).) This opinion must be excluded for several reasons.

First, Teledyne's NACES-based claims do not support a claim for alleged lost future NACES repair income. As the Court noted in its summary judgment order, Teledyne has asserted that its fraud and fraudulent concealment claims are based on two alleged acts of "concealment" by Martin-Baker related to NACES (namely, that Martin-Baker did not inform Teledyne "that it **did not advise the Navy** that Teledyne's proposed solution for the replacement of the FAST sequencer was pursuant to Martin-Baker's enhanced specifications not the Navy's specifications"; or that it "intended to present only one solution-Martin-Baker's solution-to the Navy for the replacement of the FAST sequencer.") (ECF #136 at 11) (emphasis added.) However, Mr. Newton admitted at his deposition that he never actually reviewed the supposed "lost contract" on which Teledyne's claim is based. (Ex. 2 at 99:8-102:23.) Mr. Newton did not know what kind of contract it was, whether it was a design and development contract, or when it was allegedly awarded. (*Id.* at 100:2-18.) Indeed, Mr. Newton admitted that he did no independent work to confirm whether a causal relationship existed between the contract he had never seen and the repairs he alleges that contract entitles Teledyne to. (Ex. 2 at 102:14-103:10.) This makes Mr. Newton's opinions entirely unreliable.

Second, Mr. Newton bases his estimates of the future revenue that Teledyne supposedly will not obtain from future repairs of the hypothetical "FASTr sequencer" on the prior revenue that Teledyne generated from two different sequencers, i.e., the NACES and FAST sequencers. (Ex. 1 at 13-14.) Yet, Mr. Newton made this assumption without ever reviewing or analyzing any of Teledyne's prior repair contracts. (Ex. 2 at 254:5-7.) Indeed, Mr. Newton admitted at his deposition that he did not review a single prior Teledyne repair contract in

DOCUMENT PREPARED ON RECYCLED PAPER

forming his opinions. (*Id.*) He simply took assumptions that Teledyne provided and inserted those numbers into his damages model, i.e., an Excel spreadsheet. (Ex. 2 at 194:11-17; 201:1-14.) Such testimony must be excluded as unreliable.

### D. Mr. Newton's opinions also are based on the inherent speculation that Martin-Baker would contract in the future with Teledyne

There is no dispute that Martin-Baker is the designated sole source supplier of the NACES seat to the US Navy. (ECF #122-1 at 3 ¶ 22.) As such, Martin-Baker has the absolute right to select its supplier for each lot of sequencers. Despite this, Mr. Newton's opinions are based on the assumption that Martin-Baker would have exercised its discretion and authority to contract with Teledyne for the purchase of sequencers for the next **forty-three years** (from 2018 to 2060). This is pure speculation and Mr. Newton's calculation based on this speculation are unreliable and should not be admitted into evidence.

### E. Mr. Newton's Miscellaneous Errors and Unfounded Opinions

In addition to the foregoing, Mr. Newton's proffered analysis includes a number of errors or unfounded opinions. First, Mr. Newton's opinion that Teledyne would have obtained a **68.87%** profit margin on future sales of "FASTr sequencers" to Martin-Baker over the next forty-three years suffers from the same critical flaws as his opinion that Teledyne would have achieved the same profit margin on future sales of JSF sequencers to Martin-Baker. *See infra* at 18, *et seq.*

Second, Mr. Newton admitted to using the incorrect component price for his calculations of the assumed lost revenue from Teledyne's assumed lost future sales of the "FASTr sequencer." Specifically, Teledyne's theory of the case is that but for Martin-Baker's alleged acts, it would be Teledyne's new MASS sequencer that would be used on the NACES program going forward. (Ex. 2 at 106:19-107:7; 108:6-11.) Despite this, Mr. Newton admitted at his deposition that he did no analysis of the price at which Teledyne might have sold its MASS sequencer to Martin-Baker for the NACES program. (Ex. 2 at 250:18-20.) Instead, Mr. Newton

used the last-known price of an entirely different sequencer – the now-obsolete JSFAST sequencer – as a proxy for the future MASS price. (Ex. 1 at 13.) This has no basis in fact and is therefore unreliable. *See Cabrera*, 134 F.3d at 1420.

Third, Mr. Newton's calculations for Teledyne's assumed future lost sequencer sales assumes that the price of NACES sequencers would increase by 2.5% year-on-year for the next forty-three years, (Ex. 1 at 10, n. 12); yet Mr. Newton admitted at his deposition that he did no analysis to substantiate this assumption. (Ex. 2 at 243:13-245:20.) This assumed price increase – which takes the putative prices of a NACES sequencer from $18,740 in 2018 to $71,285 in 2060 (Ex. 1 at 12 (Schedule 4.0) – combined with Mr. Newton's inflated profit margin – has the effect of substantially inflating Teledyne's damages. Because this assumed 2.5% uplift has no evidentiary or analytic support, it must be excluded.

## V.   MR. NEWTON'S JSF PROGRAM OPINIONS

Under California law, damages cannot be recovered for breach of contract unless such damage are "clearly ascertainable in both their nature and origin." Cal. Civil Code Section 3301. While speculative damages are prohibited (i.e., damages must be "clearly ascertainable"), the amount of damages need not be proven with absolute certitude, if the damage is clear. *Acree v. General Motors Acceptance Corp.* (2001) 92 CA4th 385 ("The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation.") Lost profits only are recoverable if their extent and occurrence can be proven. *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 CA4th 435. Finally, in all cases, damages may not be unreasonable, unconscionable, grossly oppressive damages, or contrary to substantial justice. Cal. Civ. Code § 3359.

Mr. Newton's calculation of Teledyne's alleged damages in relation to the JSF program violate all of these provisions.

A.   **Mr. Newton's opinion on Teledyne's alleged damages from future lost JSF repair contracts should be excluded**

Mr. Newton first error with respect to Teledyne's JSF claims is to include calculations for a category of damages that is not recoverable by Teledyne in this case in any event –alleged lost profit from future repairs of JSF sequencers. (Ex. 1 at 11.)

The general principle governing measure of damages for a breach of contract in California was enunciated by the California Supreme Court in *Lewis Jorge Construction Management, Inc.*:

> Damages awarded to an injured party for breach of contract "seek to approximate the agreed-upon performance." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515. The goal is to put the plaintiff "in as good a position as he or she would have occupied" if the defendant had not breached the contract. (24 Williston on Contracts (4th ed. 2002) § 64:1, p. 7.) In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain. (*Id.* at pp. 9-10; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813, pp. 732-733.

34 Cal. 4th at 967-68. Under California Civil Code § 3358, the injured party's damages cannot exceed what it would have received if the contract had been fully performed on both sides.

Here, the basis for Teledyne's damage claims in relation to the JSF program is the June 24, 2003 Letter of Agreement (the "LOA"). However, the LOA is a supply contract, not a repair contact. Nowhere in the LOA is there any mention of any contractual entitlement for Teledyne to repair JSF sequencers. Confirming this, Teledyne ***does not*** allege in its Amended Complaint any contractual entitlement to repair JSF sequencers or claim in consequence thereof. Indeed, the word "repair" is not once used in the entire Amended Complaint. (ECF #34.) Given that Teledyne has not alleged that Martin-Baker breached any contract for future JSF sequencer repairs, Mr. Newton's opinions regarding the amount of lost income from such future JSF repairs must be excluded. *See Daubert*, 509 U.S. at 591 ("[e]xpert

DOCUMENT PREPARED ON RECYCLED PAPER

MOTION IN LIMINE NO. 3 TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF EXPERT MARK NEWTON

testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" to the jury as it does not "fit" the factual dispute that jury is asked to resolve.).

> **B.** **Mr. Newton's opinions regarding Teledyne's alleged lost profit from future sales of JSF sequencers to Martin-Baker should be excluded because they are based on pure speculation or erroneous assumptions**

Mr. Newton's calculates Teledyne's alleged lost profit from future sales of JSF sequencers to Martin-Baker by (1) assuming a future number of JSF sequencers that Teledyne would sell to Martin-Baker over the next forty-three years through 2060; (2) taking an assumed starting sales price for this JSF sequencer and escalating it by 2.5% year-on-year for the next forty-three years (3) applying that escalated price to an assumed number of sequencer sales per year to generate a total amount of "lost revenue" and (4) applying a flat profit percentage of **68.87%** to this alleged lost revenue (before discounting it back to present value). Each of these steps in Mr. Newton's calculations is unreliable, for the reasons set forth below, and should be excluded.

> **1.** **Mr. Newton's opinion that it would sell 9,300 future JSF sequencers to Martin-Baker is pure speculation and should be excluded**

Mr. Newton's projections of future JSF sequencer sales by Teledyne to Martin-Baker is based, in the first instance on the U.S. Government's current projected procurement plan for JSF aircraft. This procurement plan is set out in the U.S. Government Accountability Office's 2016 report regarding the JSF program (the "2016 GAO Report") upon which Mr. Newton relies. (*See* Ex. 1 at 6, n. 5; *see also* ECF #148-3 (GAO Report) As set forth therein, the U.S. Department of Defense ("DOD") projects JSF aircraft purchases through 2038, at which point purchases will cease, and that during this remaining 20+ year period of time a total of **3,215 JSF additional aircraft** will be purchased. (*see also* Ex. 1 at 17 (Schedule 6.0)). By way of comparison, from inception of the JSF program through 2015, the

DOCUMENT PREPARED ON RECYCLED PAPER

JSF program has only ordered a total of **137 aircraft**. (Ex. 1 at 7, Table 2.)

There is no certainty, of course, that the 3,215 total number of JSF aircraft projected by the DOD will in fact be purchased. The reasons for this uncertainty are set out at length in the rebuttal report submitted by Martin-Baker expert witness (FTI), and include the need for Congressional appropriations year-after-year to fund such projected purchases, that the DOD's procurement plan for the JSF program has been decreasing, not increasing (having reduced by 14% since the initial projections), the inherent uncertainty in any future government contracts, the extreme cost associated with the JSF program that might result in further reductions or cancellations in the program, continued funding issues in the JSF program, the fact that there will be a change in U.S. Administrations by at the latest, 2024, which often is accompanied by a change in defense spending, the President's recent vocal criticism of the JSF program, and other factors. (ECF #148-4 at 2-8.) Such risk factors – none of which were assessed by Mr. Newton – render the number of future JSF aircraft purchases, beyond the immediate future, highly speculative and uncertain.

What is certain, however, is that there is no evidence whatsoever that Congressional appropriations and contracts for the purchase of more than the DOD's total projection of **3,215** additional JSF aircraft through 2038 will ever come into existence. Despite this, Mr. Newton's calculations are based on the assumption that there will be a total of **9,300** JSF sequencers supplied by Teledyne to Martin-Baker through the year 2060. (Ex. 1 at 4.) This is complete speculation and must be excluded. *See Citri-Lite Co. v. Cott Beverages*, 721 F. Supp. 2d 912, 937–38 (E.D. Cal. 2010) (holding that plaintiff count not recover lost profits based on a hypothetical renewal of the parties' contract on determination that "there is no evidence that [defendant] would have renewed the Agreement once, let alone five times, and there is no evidence that [defendant] would have exercised the purchase

DOCUMENT PREPARED ON RECYCLED PAPER

option."); *see also Lapinee Trade, Inc. v. Boon Rawd Brewery Co., Ltd.*, 91 F.3d 909 (7th Cir. 1996) (applying California law) (district court did not err in awarding three years of lost profits to beer distributor after supplier terminated at-will distributor agreement because three years is a "reasonable period"); *see also Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 469 (1990) (cutting off lost profits after five years).

## 2.   Mr. Newton's assumption that there will be 1,259 "additional planes" is pure speculation

Mr. Newton exceeds the DOD projections through a number of entirely unsupported assertions. The first of these is the assumption that the JSF program will order an additional 1,259 "additional planes" beyond the total 3,215 JSF additional aircraft projected by the DOD. (*See* Ex. 1 at 6.) The only support for this assumption is a stated "conservative estimate" by Teledyne. (*Id.*) At his deposition, Mr. Newton admitted that he only used this 1,259 unit number because two Teledyne representatives told him that they expected there would be 4,500 JSF aircraft ordered under the JSF program. (Ex. 2 at 121:19-122:13.) Mr. Newton further admitted that he did not know the basis on which these Teledyne people came up with this estimate. (*Id.* at 122:9-10.) Despite this, Mr. Newton assumed this speculative 4,500 number to be true, relied on it, and subtracted from it the actual total number of 3,215 JSF aircraft projected by the DOD, but not yet ordered or committed. (*Id.* at 121:19-122:13.) This is nothing but regurgitation of a self-serving assertion by Teledyne, and thus must be excluded. *See Dep't of Toxic Substances Control v. Technichem, Inc.*, 2016 WL 1029463, at *1 (N.D. Cal. 2016) (excluding expert's testimony because, "[w]hen he is not simply speculating, [the witness] often does no more than regurgitate information given to him by other sources (including self-serving assertions by the [parties]). He [does] not analyze

DOCUMENT PREPARED ON RECYCLED PAPER

his source materials so much as repeat their contents.")[3]

### 3. Mr. Newton's assumption that there will be 229 JSF "spares" is pure speculation

Mr. Newton's opinion also assumes that that there will be 229 "spare" sequencers supplied by Teledyne to Martin-Baker for the JSF program over the course of the next **forty-three years**. (Ex. 1 at 7.) The sole basis for this assumption, however, is that this is what Teledyne told Mr. Newton. (*Id.*) ("According to TESP, spare sequencers are typically carried at a rate of 5% of active in-service aircraft. As a result, I have used 5% to estimate 229 spare sequencers TESP would have delivered as part of the JSF program.") At deposition, Mr. Newton admitted that he did not do any work to independently verify the accuracy or reliability of the 5% number provided to him by Teledyne. (Ex. 2 at 181:2-6) ("Did you do any work to verify Teledyne's statement that spares are carried at a rate of 5 percent of active in-service aircraft? A No. We -- we did not do any particular review of that assumption that we make.") He also admitted that "in hindsight, it would be preferable to have actual records to verify [the client's estimate]." (*Id.* at 181:22-182:10.) As there is no evidentiary foundation whatsoever for Mr. Newton's assumption of 229 future "spares," Mr. Newton's damage calculations based on this number also should be excluded.

### 4. Mr. Newton's assumption that Teledyne would sell an additional 3,710 "periodic replacement" JSF sequencers to Martin-Baker is pure speculation

Mr. Newton dramatically inflates his calculation of Teledyne's purported JSF damages by assuming that all JSF sequencers will need to be replaced after 20 years. Ex. 1 at 8. On the back of this assumption, Mr. Newton calculates that

---

[3] Mr. Newton's unsupported references to the number of aircraft purchased in the F-16 and F-18 programs is irrelevant and unreliable given his admission that he only cited these program at Teledyne's direction, (Ex. 2 at 126:9-127:4), and that he did not undertake any analysis of these programs. (*Id.* at 127:5-128:5.)

DOCUMENT PREPARED ON RECYCLED PAPER

Martin-Baker would purchase an additional **3,710** JSF "periodic replacement" sequencers from Teledyne, starting in **2036** and continuing for the next **twenty-four years** through **2060**. By way of a simple comparison, this projected additional 3,710 JSF replacement sequencers is more than the total number of **3,215** JSF aircraft projected for purchase by the DOD through the entire duration of the JSF program.

Mr. Newton's sole support for this critical assumption, again, is another naked statement provided by Teledyne. *Id.* ("According to TESP, the sequencers will have a service life of at least 20 years.") No document, deposition testimony or evidence of any kind is cited by Mr. Newton to support this assertion. Instead, Mr. Newton admitted at his deposition that he, again, undertook no analysis whatsoever to confirm the reliability of Teledyne's assertion, and simply took it to be true. (Ex. 2 at 206:6-25.) Given that there is no evidentiary foundation whatsoever for Mr. Newton's "regurgitated" assumption that all JSF sequencers will be replaced 20 years after installation, Mr. Newton's calculation of damages on the basis of this assumption must be excluded as pure speculation.

### 5. Mr. Newton's assumption that Teledyne would supply an additional 454 "beyond economic repair replacement" JSF sequencers to Martin-Baker is pure speculation

Mr. Newton also assumes that Teledyne would have supplied an additional 454 "beyond economic repair replacement" JSF sequencers to Martin-Baker. The basis for this assumption is the following statement: "The estimate for BERs is based upon the historical experience for NACES and FAST which is displayed on Schedule 6.2." (Ex. 1 at 8.) This cannot be accepted as reliable, however, given that Mr. Newton admitted at deposition that he did no work to verify whether the "beyond economic repair replacement rates" for the NACES and FAST program were a valid proxy for the future replacement of the different Martin-Baker JSF Sequencer that will be used in the JSF program:

Q. "Beyond Economic Repair Replacements," that's your next section

- 16 -

DOCUMENT PREPARED
ON RECYCLED PAPER

MOTION IN LIMINE NO. 3 TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF EXPERT MARK NEWTON

1    in your report on Page 8 under JSF?

2    A Yes.

3    Q And you base this projected rate of beyond economic repair
     replacements on the historical experience for NACES and FAST; is
4    that right?

5    A Yes.

6    Q As with the repairs, was this based on a assertion by Teledyne to
     you that you accepted that the beyond economic repair or replacement
7    rates for NACES and FAST would be similar to the beyond 04:10:36
     economic repair or replacement rates for the Martin-Baker JSF
8    sequencer?
9

10   A Yes.

11   Q Am I correct to assume that you did no independent work to verify
     whether the NACES, FAST 04:10:50 rates were a valid proxy for the
12   beyond economic repair or replace rates for the Martin-Baker JSF
     sequencer?
13

14   A No.

     Q So, again, this is just taking an assumption from Teledyne and then
15   modeling it?

16   A Yes.

17   (Ex. 2 at 219:24-220:22.) Given this, Mr. Newton's assumption that Teledyne

18   would sell 454 future "beyond economic repair units" to Martin-Baker is unreliable,

19   and the damages he calculates on the basis of this assumption must be excluded.

20       **C.    Mr. Newton's assumed future sales price of JSF sequencers is**
              **based on erroneous speculation**
21

22       Teledyne's theory of the case for its JSF claims is that Martin-Baker should

23   have provided it with the build-to-print package of the Martin-Baker JSF Sequencer

24   ("MBA JSF sequencer") to manufacture on an exclusive basis. (Ex. 2 at 225:17-21.)

25   Yet, instead of using a hypothetical price for the sale of the Martin-Baker JSF

26   Sequencer (for which data is available, see FTI Report at 9-10 (ECF #148-4), Mr.

27   Newton uses the last-known sales price of the JSFAST sequencer for his

28   calculation. (Ex. 1 at 9.) This is improper given that the JSFAST sequencer is no

DOCUMENT PREPARED
ON RECYCLED PAPER

longer capable of being produced. (Ex. 2 at 68:6-69:24.) Accordingly, the use of the JSFAST sales prices results in damages that are neither reasonable nor that flow directly from the alleged breach nor is it a natural result of the breach. *See San Diego Gas & Elec. Co.*, No. 15CV605-MMA (KSC), 2016 WL 6680205, at *7 (Contract damages must be those that "flow directly and necessarily from a breach of contract, or that are a natural result of a breach.") Mr. Newton's use of the JSFAST sales price as the basis for his damages calculations thus must be excluded.

As explained by FTI, Mr. Newton's use of an erroneous starting price for his calculations, instead of the actual, far lower price of the Martin-Baker JSF sequencer, has the effect of inflating Mr. Newton's damage calculations by at least $20.3 million, ceteris paribus (ECF #148-4 at 9-10.)

### D.    Mr. Newton's opinion regarding Teledyne's projected future profit margins must be excluded

Mr. Newton opines that Teledyne would have obtained a **68.87%** profit margin on future sales of JSF sequencers to Martin-Baker over the next forty-three years. This is absurd and, for the following reasons, this opinion must be excluded.

First, Teledyne's historic profit margin on sales of sequencers to Martin-Baker over the past 30 years has been **12-15%**. This alone proves that Mr. Newton's calculated profit margin of **68.87%** is grossly inaccurate. The details of Teledyne's historic profit margins are set out in FTI's rebuttal report:

> In the normal course of its business of selling sequencers to MBA over the past 30 years, TESP has submitted cost and pricing data to MBA. This cost and pricing data is required by U.S. law to be truthful, current, and correct. MBA relies on this TESP cost and pricing data to negotiate with TESP and award sequencer purchase contracts. In its cost and pricing data, TESP represents to MBA that its sequencer production costs include certain categories of costs, e.g., TESP's overhead and selling, general and administrative costs ("SG&A") and other burdens. Newton has not included these categories of costs in his analysis. This is incorrect given TESP's prior representations.
>
> TESP's cost and pricing data also states the amount of profit that

DOCUMENT PREPARED
ON RECYCLED PAPER

MOTION IN LIMINE NO. 3 TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF EXPERT MARK NEWTON

TESP will obtain on the sale of sequencers to MBA. TESP's stated profit margins are between 12% and 15%.

(ECF # 148-4 at 10.) At his deposition, Mr. Newton did not dispute the accuracy of FTI's review of Teledyne's historic profit margin on sequencer sales to Martin-Baker, and that such margins have been **12-15%**. (Ex. 2 at 260:19-261:10; 282:20-283:18.) Indeed, Mr. Newton also admitted that if Martin-Baker were to purchase future JSF sequencers from Teledyne then he understood that Teledyne would achieve this same **12-15%** historic profit margin. (*Id.* at 284:12-25.) Finally, Mr. Newton confirmed that he understood that Teledyne's historic 12-15% profit margin on sequencer sales to Martin-Baker was charged **on top of** all costs incurred by Teledyne that were properly allocable to the manufacture of the sequencer. (Ex. 2 at 284:2-17.) And, Mr. Newton admitted that Teledyne represented to Martin-Baker the amount of allocable costs that it incurred with respect to the manufacture of a sequencer, and that such Teledyne representations were required by law to be true and accurate. (Ex. 2 at 259:9-260:7.)

It is well-established that the measure of damages for lost profits for breach of contract is revenue less all expenses associated with production of the item in question. *See*, *e.g.*, *Resort Video, Ltd. v. Laser Video, Inc.*, 35 Cal.App.4th 1679, 1700 (1995) (Even if [plaintiff] was able to provide credible evidence of lost profits, it must be remembered that '[w]hen loss of anticipated profits is an element of damages, it means net and not gross profits. Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.'") Here, based on Teledyne's representations to Martin-Baker, after deduction of all expenses allocable to the manufacture of the "lost sequencers" on which Teledyne bases its claims, the maximum amount of profit that Teledyne would have obtained on future sales of sequencers to Martin-Baker is the **12-15%** profit margin that Teledyne has obtained on sequencer sales to Martin-Baker over the past 30 years. As such, Mr. Newton's

DOCUMENT PREPARED ON RECYCLED PAPER

opinion that Teledyne would more than quadruple its maximum standard profit margin to **68.87%**, must be excluded as such opinion has no basis in the record, relies on unsupported assumptions and pose a great danger of misleading a jury.[4] *McGlinchy v. Shell Chem. Co*., 845 F.2d 802, 807 (9th Cir. 1988).

As explained by FTI, Mr. Newton's use of an erroneous profit margin for his calculations, has the effect of inflating his JSF damage calculations by at least $39.1 million, ceteris paribus (ECF #148-4 at 11-12.)

## VI.  **CONCLUSION**

For the foregoing reasons, Martin-Baker respectfully requests that Mr. Newton's opinions be precluded or limited as set forth above, and set forth in the attached proposed order.

Dated: October 17, 2017

MATTHEW H. KIRTLAND
KATHERINE G. CONNOLLY
JOSHUA D. LICHTMAN
**NORTON ROSE FULBRIGHT US LLP**


By __/s/ Katherine G. Connolly__
    KATHERINE G. CONNOLLY
Attorneys for Defendant/Counter-Plaintiff
MARTIN-BAKER AIRCRAFT
COMPANY LTD.

---

[4] One of the fundamental flaws in Mr. Newton's profit margin methodology is readily apparent, i.e., he ignores Teledyne's own financial statements to misstates Teledyne's fixed costs and then he assumes that such costs would remain constant for the entire forty-three year period over which he assumes Teledyne would sell additional JSF sequencers to Martin-Baker. (Ex. 2 at 292:13-19; 297:16-298:11.) Yet, Mr. Newton also admitted to doing no analysis as to the variability of Teledyne's supposed "fixed" costs. (*Id.* at 295:7-13.) This is inherently unreliable.

DOCUMENT PREPARED
ON RECYCLED PAPER